# EXHIBIT E

```
 1           IN THE DISTRICT COURT OF THE UNITED STATES
 2              FOR THE EASTERN DISTRICT OF WISCONSIN
 3
 4   DANIEL MCGRAW AND
 5   SUSAN MCGRAW,
 6                    Plaintiffs,
 7            vs.           Civil Action No. 1:15-CV-1424-WCG
 8   SUPERIOR AVIATION, LTD.,
 9   KUBICK AVIATION SERVICES, INC.,
10   and QBE INSURANCE CORP.,
11                    Defendants.
12   _____
13
14
15       The Videotaped Deposition of TIMOTHY SPREEN,
16       Taken at 2501 Worldgateway Place, Cortez Room,
17       Romulus, Michigan,
18       Commencing at 5:34 p.m.,
19       Monday, June 27, 2016,
20       Before Kathryn L. Janes, CSR-3442, RMR, RPR.
21
22
23
24
25
```

Veritext Legal Solutions
www.veritext.com  888-391-3376
Case 1:15-cv-01424-WCG   Filed 09/30/16   Page 2 of 7   Document 26-6

Page 6

1  themselves and the parties they represent.  Our court
2  reporter, Kathy Janes, representing Veritext will
3  swear in the witness and we can proceed.
4       MR. TECHMEIER:  My name is Will Techmeier.
5  I represent Daniel and Susan McGraw.
6       MR. LORINGER:  John Loringer for Defendant,
7  Superior Aviation.
8       MR. KLINGAMAN:  Russ Klingaman at Hinshaw &
9  Culbertson for Defendant, Kubick Aviation.
10           TIMOTHY SPREEN,
11  was thereupon called as a witness herein, and after
12  having first been duly sworn to testify to the truth,
13  the whole truth and nothing but the truth, was
14  examined and testified as follows:
15
16           EXAMINATION
17  BY MR. LORINGER:
18  Q.  Could you please state your name and spell your last
19     name for the record?
20  A.  Timothy Spreen, S-P-R-E-E-N.
21  Q.  Mr. Spreen, we've talked before today, my name is John
22     Loringer.  I'm representing Superior Aviation in this
23     case.  We appreciate you being here today.  My
24     understanding is, one, you are currently employed by
25     the FAA, correct?

Page 7

1  A.  That's correct.
2  Q.  Okay.  And secondly, you have a statement to read onto
3     the record today, correct?
4  A.  I do.
5  Q.  From FAA Legal?
6  A.  Correct.
7  Q.  Yeah, why don't go ahead and do that, please.
8  A.  My opening statement would be that I would like a copy
9     of the deposition and that I am going to read it and
10    sign it.  Also I'd like to make a statement on the
11    record that under 49 C.F.R., Part 9, I am prohibited
12    from testifying as to matters related to my FAA
13    employment or giving any opinion testimony.
14  Q.  Okay, thanks, Tim.  And if -- I'll start by asking you
15    some questions and I'll keep that in mind, those
16    admonitions, but again, of course, I'll try to stay
17    away from your opinions, but if that comes up or you
18    feel we're getting into that territory somehow, please
19    let us know, okay?
20  A.  Okay.
21  Q.  Fair?
22  A.  Fair.
23  Q.  Just a couple ground rules, we talked before, but just
24    kind of how the deposition is going to proceed.  Just
25    let me get my question out before you offer any type

Page 8

1     of response, that's for the benefit of the court
2     reporter so she doesn't have to try to take down two
3     people talking at the same time, okay?
4  A.  Okay.
5  Q.  If I remind you of that, and it happens at every
6     deposition, I'm not trying to be rude, it's just for
7     the sake of the court reporter, okay?
8  A.  (Witness nods head affirmatively.)
9  Q.  Please let me know if you don't understand one of my
10    questions, I'll be happy to rephrase it or ask it
11    again, fair?
12  A.  Fair.
13  Q.  Okay.  What's your date of birth, Tim?
14  A.  October 25, 1970.
15  Q.  Okay.  Where were you born?
16  A.  Escanaba, Michigan.
17  Q.  Okay.  Can you summarize your educational background
18    for me?
19  A.  Six years U.S. Army, I left the army in 1995, went to
20    Northern Michigan University, graduated with an
21    Associate Degree in science and aircraft maintenance
22    and technology.  Which soon after, I obtained my A & P
23    license, started working for Superior Aviation in
24    1997, worked with them for ten years.  And soon after,
25    around 2006, 2007, I started my own aircraft

Page 9

1     maintenance business at the Menomonee County Airport.
2     And I ran the airport as an airport manager and ran an
3     aircraft maintenance business.
4  Q.  Okay.  Let's talk about your education for a second,
5     what year did you graduate from Northern Michigan?
6  A.  1997.
7  Q.  Okay.  And what was your degree in when you graduated?
8  A.  It was an Associate in applied science and aircraft
9     maintenance and technology which is a required class
10    or required course to take to get your A & P license.
11  Q.  Okay.  And then after graduation, did you seek your A
12    & P certification?
13  A.  Correct.
14  Q.  And what did that entail?
15  A.  It entailed taking a written test.
16  Q.  How many tests, is it one or more?
17  A.  It's one test.
18  Q.  Okay.  Did you pass on the first occasion?
19  A.  Yes.
20  Q.  Okay.  So you became a licensed A & P in 1997?
21  A.  Correct.
22  Q.  Okay.  Do you also have your Inspection Authorization?
23  A.  I do.
24  Q.  Okay.  First, generally what's an Inspection
25    Authorization?

3 (Pages 6 - 9)

Veritext Legal Solutions
Case 1:15-cv-01424-WCG   Filed 09/30/16   Page 3 of 7   Document 26-6
www.veritext.com                                         888-391-3376

Page 10

1  A. It gives you the authority to sign annual inspections
2     and major repairs.
3  Q. Okay. When did you -- when did you get that, your IA?
4  A. Roughly four years afterwards.
5  Q. Okay.
6  A. After I received my A & P, it's a requirement, you
7     have to have at least three years before you can take
8     it as an A & P mechanic.
9  Q. Is there a test associated with becoming an IA?
10 A. Yes.
11 Q. Okay. One test?
12 A. Yes.
13 Q. Okay. And are you currently a licensed A & P?
14 A. Correct.
15 Q. And are you currently a licensed IA?
16 A. Yes.
17 Q. Are you also a pilot?
18 A. I am.
19 Q. Okay. When did you become a licensed pilot?
20 A. 12 years ago.
21 Q. Okay. What ratings do you hold?
22 A. Single Engine Land.
23 Q. Okay. Have you had a Single Engine Land rating
24    consistently over the last 12 years, actively over the
25    last 12 years?

Page 11

1  A. Correct.
2  Q. Okay. How many flight hours do you have?
3  A. Roughly 900.
4  Q. Okay. Do any of those 9 -- 900 hours include time in
5     a Lancair?
6  A. No.
7  Q. How much, just for background, how much have you flown
8     in the last year and a half or so?
9  A. Less than ten hours.
10 Q. Okay. You were in the army for six years before
11    Northern Michigan?
12 A. Correct.
13 Q. Okay. What -- what was your -- what was your rank in
14    the army?
15 A. A specialist, E4.
16 Q. Okay. Honorable discharge?
17 A. Correct.
18 Q. You graduated from Northern Michigan in about 1997 and
19    then some time shortly after graduation, you go to
20    work for Superior?
21 A. I took an internship with Superior. I shouldn't say
22    an internship, I took a job with Superior Aviation
23    prior to my leaving college and then finished college
24    while working for Superior.
25 Q. Okay. So when -- what was your title after you

Page 12

1     graduated at Superior?
2  A. Mechanic.
3  Q. Okay. So when you passed your A & P exam, you became
4     a mechanic, your title at Superior became mechanic?
5  A. Correct.
6  Q. Okay. And how long were you a mechanic at Superior
7     for them?
8  A. Roughly ten years.
9  Q. Okay. Any other job during those ten years or were
10    you only working for Superior at that time?
11 A. I believe it was I had a stint with -- with Brooks
12    Aviation for a year and then went back with Superior,
13    but I don't really remember what year that was.
14 Q. Also a mechanic at Brooks?
15 A. Correct.
16 Q. Okay. And then where did you go after ten years at
17    Superior, so this is about 2007?
18 A. Correct, 2006, 2007, I started my own aircraft
19    maintenance business.
20 Q. And what was the name of that business?
21 A. Spreen Aviation.
22 Q. Were you based at a particular airport?
23 A. I had my local address as my base, but then I used
24    Menomonee County Airport as my fixed base.
25 Q. And how long did you -- were you working with your own

Page 13

1     business, Spreen Aviation?
2  A. Until 2011, when I joined forces with Bruce Varda and
3     Superior Aviation.
4  Q. Okay. So for about three or four years, you had
5     Spreen Aviation?
6  A. Five.
7  Q. Five years.
8  A. 2011.
9  Q. Got it. 2011, you went back to Superior?
10 A. Correct, got it.
11 Q. What was your title when you went back to Superior?
12 A. Director of maintenance and supervisor of maintenance.
13 Q. Going back for a second, I think when you were talking
14    earlier, Tim, you mentioned working at FBO; is that
15    correct? Did you -- did you do maintenance at FBO or
16    am I --
17 A. It was -- it was not at FBO, it was a -- the airport
18    that I managed that I rented a hanger and performed
19    maintenance for the aircraft on the field.
20 Q. Is this for -- this is for your time during Spreen
21    Aviation?
22 A. Correct.
23 Q. Got it. Did you have any employees at Spreen
24    Aviation?
25 A. No.

4 (Pages 10 - 13)

Case 1:15-cv-01424-WCG   Filed 03/30/16   Page 4 of 7   Document 26-6
Veritext Legal Solutions
www.veritext.com                                            888-391-3376

Page 22

1  A. Yes.
2  Q. Okay. Is that your signature there, about a third or
3     halfway down?
4  A. It is.
5  Q. Okay. And again, your A & P number?
6  A. Correct.
7  Q. Did you write this entry, do you recall?
8  A. Yes, I did write it.
9  Q. Okay. Do you recognize this to be a log entry from
10    Mr. McGraw's Lancair?
11 A. Correct.
12 Q. Could you slowly read what is written here just so I
13    make sure we have a correct understanding of what's
14    stated?
15        MR. KLINGAMAN: Excuse me, John, if you
16    could give dates or more descriptions, I don't have a
17    Bates set of these documents, just so I could follow
18    along.
19        MR. LORINGER: Sure, sorry. It is Bates
20    page Plaintiff 84, it's a log entry from February 7,
21    2014.
22        MR. KLINGAMAN: Okay, the date helped,
23    thank you.
24        MR. LORINGER: Yep.
25 A. Date 2-7-14, 278.50 inspected aircraft, IAW, which is

Page 23

1     an in accordance with, an annual, slash, condition
2     inspection. Inspected ELT in accordance with
3     91.207(d). Battery expiration date March 2017.
4         I certify that this airframe was inspected
5     in accordance with an annual condition inspection and
6     was found airworthy for return to service. My
7     signature, 2881558IA.
8  BY MR. LORINGER:
9  Q. Okay. And is the date there, the 2-7-14, is that when
10    you would have made this entry?
11 A. That would have been the date I made the entry.
12 Q. Okay. Do you know if there was any repair or
13    maintenance work done to the aircraft after this date,
14    but before Mr. McGraw picked it up on about April 10th
15    of 2014?
16 A. Yes.
17 Q. Okay. Do you have a general understanding,
18    Mr. Spreen, of what that work was that was done, that
19    repair and maintenance work?
20 A. Brief.
21 Q. Okay, what's your -- what's your brief understanding
22    of what it was? And I can show you the documents,
23    I'll show you some of the log entries in a second, but
24    I'm just trying to see what your memory is?
25 A. Considerable work done on the fuel system, the wings

Page 24

1     were removed, the fuel sending -- the fuel sending
2     units were installed. I believe there was quite a few
3     hoses replaced on the engine. I believe the engine
4     may have been -- excuse me, the engine -- the
5     propeller was taken off. Some attaching hardware to
6     the engine were replaced.
7  Q. Okay. Just to clarify, you said some hoses were
8     replaced, you don't know which hoses were replaced, do
9     you?
10 A. I believe they were --
11        MR. TECHMEIER: Leading -- wait a minute,
12    excuse me, leading.
13 BY MR. LORINGER:
14 Q. Go ahead.
15 A. I believe -- excuse me, they were oil hoses.
16 Q. Okay. Explain for me, if you could -- well, strike
17    that.
18        It would be possible, Mr. Spreen, to sign
19    off in February of 2014 as for this aircraft to be
20    airworthy and still have those repairs to be done; is
21    that correct?
22        MR. TECHMEIER: Objection, leading.
23 A. That is correct.
24 BY MR. LORINGER:
25 Q. Okay. Explain that for me, if you could, how, if you

Page 25

1     were going to explain to a layperson, someone not in
2     the aviation maintenance industry, how would you
3     explain how you could have a signoff on airworthy in
4     February and still have subsequent repair work done
5     before the pickup a couple months later?
6  A. The aircraft was inspected. It was found to be
7     airworthy. There were other items that were asked to
8     either be done or we had talked to the customer that
9     said that maybe this is a good time to get these done.
10    It doesn't mean that the aircraft is un-worth --
11    un-airworthy at the time. It is airworthy, but they
12    continued to do maintenance on it after the
13    inspection.
14 Q. Okay. But from your perspective in February, when you
15    signed off on this, February 7, 2014, the aircraft was
16    airworthy, correct?
17        MR. TECHMEIER: Objection, leading.
18 A. The aircraft was airworthy.
19 BY MR. LORINGER:
20 Q. Okay. Mr. McGraw could have come and picked it up
21    then and it would be airworthy, correct?
22        MR. TECHMEIER: Objection, leading.
23 A. At that point, yes.
24        MR. TECHMEIER: Can you ask a non-leading
25    question?

7 (Pages 22 - 25)

www.veritext.com                    Veritext Legal Solutions                    888-391-3376

Page 26

1    MR. LORINGER: Your objections are fine.
2    You can make your objection.
3    MR. TECHMEIER: I'm probably going to
4    object to a lot of questions from now on, so.
5 BY MR. LORINGER:
6 Q. So I understand, Mr. Spreen, were you involved in
7    any -- involved -- were you doing any actual repairs
8    to Mr. McGraw's aircraft after you signed off on it on
9    February 7, 2014?
10 A. Not 100 percent, no.
11 Q. Okay. Can you describe that for me, what do you mean?
12 A. If -- if the mechanics needed help, I would help them.
13 Q. Okay. Do you recall anything you did specifically?
14 A. No, nothing specifically.
15 Q. Okay. Who is it at Superior that did a majority of
16    the work then on the repair work after the condition
17    inspection?
18 A. Alex Dupras and Vincent Quadrani.
19 Q. And of those two, do you know which one did more or
20    less or do you know what the breakdown was?
21 A. They worked in conjunction with each other.
22 Q. Okay. As you sit here today, do you recall what Alex
23    did and what Vincent may have done?
24 A. I can't say one from the other.
25 Q. Okay. During this condition inspection that you

Page 27

1    signed off on that we've looked at as exhibit -- which
2    one is that -- as Exhibit 3, February 7, 2014, do you
3    recall if you inspected the fuel line connections
4    during that condition inspection?
5 A. It was part of the checklist, I did inspect it.
6 Q. Okay. And how would you have done that inspection?
7 A. Visually.
8 Q. Okay. And -- and when you say visually, what are you
9    looking for in regards to the fuel connections?
10 A. Well, you look for any foreign substance as a, like a
11    blue dye, if you're inspecting a fuel line, it would
12    be oil, if you're inspecting an oil line, maybe a
13    chafing, a hose that may be misaligned.
14 Q. Okay. When you -- when you say chafing, what do you
15    mean?
16 A. Maybe I misspoke, maybe a fretting.
17 Q. Okay. And but what -- when you say fretting, what do
18    you mean, what are you thinking of?
19 A. You'll see a black residue of metal surfaces rubbing
20    together.
21 Q. And if you see any of those, then what would you have
22    done?
23 A. Investigate to find out where the -- where the --
24    where that's coming from.
25 Q. Okay. During this condition inspection, would you

Page 28

1    have checked the tightness of all the fuel lines with
2    a torque wrench?
3 A. No.
4 Q. Okay. Why not?
5 A. It doesn't require us to per the checklist that we use
6    that's offered in the 43 -- 43 Appendix D.
7 Q. Okay.
8        MARKED FOR IDENTIFICATION:
9        DEPOSITION EXHIBIT 4
10       6:05 p.m.
11 BY MR. LORINGER:
12 Q. Let me show you another document, it's a set of three
13    pages stapled together, Bates labeled Plaintiff 305,
14    306 and 307.
15       MR. LORINGER: And for Russ, these are the
16    log entries dated April 10th, those three log entries,
17    the typed-out ones.
18       MR. KLINGAMAN: Thank you.
19 BY MR. LORINGER:
20 Q. Mr. Spreen, take a look at these and let me know when
21    you're done looking at them. Okay. Did you get a
22    chance to look at them?
23 A. I did.
24 Q. Have you seen these before?
25 A. Yes, I have.

Page 29

1 Q. Are they familiar to you? What do you recognize these
2    to be?
3 A. Maintenance repairs.
4 Q. Okay. Do you recall who put these together?
5 A. This would be from Alex Dupras.
6 Q. Okay. And these are dated April 10, 2014; is that
7    correct?
8 A. That is correct.
9 Q. Okay. Do you recall, Mr. Spreen, the circumstances of
10    how these were put together?
11 A. I told Alex to make sure he has his log book entries
12    finished.
13 Q. Okay. Do you recall when that was about that you told
14    Alex that?
15 A. After the accident.
16 Q. Okay. Sometime in May of 2014?
17 A. That is correct -- I'm sorry, I don't understand.
18 Q. Yeah, sure. The accident was in early May --
19 A. Okay.
20 Q. -- of 2014.
21 A. Okay.
22 Q. I'm just trying to align that with what you were
23    saying. Does that seem correct to you then, sometime
24    in May of 2014?
25 A. That's when I told them, correct.

1 one of the things he asked when he sent the log
2 entries to you was whether there should be any
3 changes; do you recall that?
4 A. I do not recall.
5 Q. Did you have a list of discrepancies that he needed to
6 take care of after your log entry of February 7, 2014?
7 MR. LORINGER: Objection to form, vague.
8 BY MR. TECHMEIER:
9 Q. You know what a list of discrepancies is, don't you?
10 A. Yes.
11 Q. Did you have it? Was there a list of discrepancies
12 for this aircraft after you entered your log entry of
13 February 7, 2014?
14 A. I don't recall if there was a list.
15 Q. You mentioned Valerie Varda before; do you remember
16 that?
17 A. Yes.
18 Q. And is she married to Chad Kubick?
19 A. No.
20 Q. Do you know who she's married to?
21 A. I do not.
22 Q. Chad Kubick is not the son-in-law of Bruce Varda?
23 A. No.
24 Q. When Superior -- excuse me, when the FAA did their
25 investigation of this accident, did you have to give

1 any statements to them?
2 A. No.
3 Q. When the NTSB did their investigation of this
4 accident, did you have to give any statements to them?
5 A. No.
6 Q. Did you give any statements to the insurance carrier
7 for Superior, QBE?
8 A. I don't recall.
9 Q. If you had given a statement, you state that -- you
10 have not reviewed any statement then that you might
11 have given to QBE before your deposition today?
12 A. Who is QBE?
13 Q. The insurance carrier for Superior.
14 A. I -- I don't have any recollection of -- of statements
15 given to the insurance company.
16 Q. Did they ever talk to you about this accident, besides
17 Mr. Loringer?
18 A. If it was, it would have been very early, and that I
19 don't recall.
20 MR. KLINGAMAN: Excuse me, Mr. Spreen, if
21 you could speak up a little bit, some of your answers
22 are trailing off.
23 BY MR. TECHMEIER:
24 Q. You don't recall ever talking to a person by the name
25 of Robert P. Porter, who is the -- who is the adjuster

1 for QBE on this case?
2 MR. LORINGER: Objection to form,
3 foundation.
4 A. I've spoke with Mr. Porter many a times throughout the
5 years I've worked there. I don't recall talking to
6 him about that particular case.
7 BY MR. TECHMEIER:
8 Q. What have you talked to Mr. Porter about then
9 besides -- not -- not this case, but other, in other
10 matters?
11 A. Other insurance jobs that we had through Superior
12 Aviation.
13 Q. Would it have been accident claims?
14 A. I don't recall that.
15 Q. You stated that you visually inspected the fuel lines
16 of this aircraft?
17 A. Correct.
18 Q. And you found that the fuel line was properly
19 tightened?
20 A. Which fuel line?
21 Q. All the fuel lines.
22 A. I inspected every fuel line and not one of them had a
23 problem.
24 Q. You did not torque any of the fuel lines?
25 A. I did not torque any of the fuel lines.

1 Q. You didn't put a wrench to any of them?
2 A. I did not put a wrench to any of them.
3 Q. And you didn't touch any of them?
4 A. I probably touched every one of them.
5 Q. For what purpose?
6 A. That's how I inspect, I run my fingers over things
7 and -- and check for abnormalities.
8 Q. So you would hand tighten something that was
9 loosened -- that was loose?
10 A. No.
11 MR. LORINGER: Just a belated objection to
12 form, foundation on that last question.
13 BY MR. TECHMEIER:
14 Q. Well, did you find that when you touched any of these
15 fittings, that any of the fittings were loose?
16 A. They were not loose.
17 Q. Why did you touch them?
18 A. That's part of my inspection process, you physically
19 put your fingers on it to see if they move, and if
20 they move in a different direction than they're
21 supposed to, that was -- that's part of the -- that's
22 part of my process of inspecting.
23 Q. And if they move in a way that they're not supposed
24 to, then what must be done; what do you have to do?
25 A. See why it's doing what it's doing.